Filed 11/4/25  P. v. Varela CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>MICHAEL AON VARELA,<br><br>　　Defendant and Appellant. | G062986<br><br>(Super. Ct. No. 17WF1965)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Patrick H. Donahue, Judge. Affirmed.

Raymond M. DiGiuseppe, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Christopher P. Beeseley, Deputy Attorneys General, for Plaintiff and Respondent.

After his first trial ended in a hung jury mistrial, defendant Michael Aon Varela was retried and convicted of special circumstances felony murder. On appeal, he contends: (1) the trial court erred in admitting evidence of his bad character; (2) the prosecutor compounded the error by misusing the evidence in closing argument; (3) the court committed multiple instructional errors; and (4) there is insufficient evidence to support the jury's verdict. Finding no basis to disturb the judgment, we affirm.[1]

STATEMENT OF FACTS

In the early morning of September 10, 2017, 68-year-old Dzung Nguyen was fatally attacked while walking in her neighborhood in search of recyclable cans and bottles. The central issue at Varela's trial was the identity of Nguyen's attacker. The jury had to decide whether Varela was the person who attacked Nguyen, as the prosecution alleged, or Varela was wrongly accused simply because he tried to assist Nguyen after someone else had attacked her, as the defense claimed.

At the time of the incident, Varela was 30 years old and living with his father, Carlos, in a house near Beach Boulevard and the 22 Freeway. Despite struggling with alcohol addiction in his early 20s, Varela had been sober for several years. He was also working and taking college classes in an attempt to turn his life around. In the days leading up to Nguyen's murder, however, Carlos sensed Varela was feeling a bit down about something. And

---

[1] By separate order filed contemporaneously with this opinion, we deny Varela's petition for a writ of habeas corpus, which alleges his trial attorney was ineffective for not making sufficient objections in the trial court to preserve some of the issues he raised in this appeal. Varela's motion to consolidate the habeas petition filed on June 21, 2024, in case No. G064291 with the direct appeal, is denied.

2

when Varela left the house the night before Nguyen was attacked, Carlos worried his son might fall off the wagon and start drinking again.

As it turned out, Varela drank heavily that evening and did not return home until early the next morning. He parked his car in front of his house at about 4:38 a.m. At that time, Nguyen, who lived in the area, was out on her usual early morning walk, looking for recyclable items. Her husband had warned her walking alone before sunrise could be dangerous, but she regularly did so. Nguyen was five foot three and weighed less than 100 pounds at the time she was killed.

The prosecution did not present any direct evidence as to what happened to Nguyen that morning.[2] However, shortly after 5:00 a.m., about 20 minutes after Varela arrived home, Carlos saw a shocking scene when he opened his front door to run some errands. Nguyen was lying unconscious in his front yard, about 10 feet away. Her face was beaten and bloodied, and except for a black sweatshirt that was pulled up above her breasts, she was completely naked.

Varela was in the yard, too. He was kneeling next to Nguyen and appeared to be tending to her, as far as Carlos could tell. Varela was not wearing a shirt, however, and his pants were riding low at the waist with his boxer briefs exposed. All but one of the buttons on his button-up fly were undone, and there was blood on his hands, face, and chest.

Alarmed and perplexed, Carlos stepped outside and asked Varela what was going on. Varela did not answer the question; he merely said, "[W]e have got to help this woman." Carlos called 911 and continued to press

---

[2] Although there were some surveillance cameras in the area, none of them captured Nguyen or Varela on tape.

Varela for information. He wanted to know what happened to Nguyen and how she got there. In response, Varela became very defensive and exclaimed, "[W]hat, you think I did this?" He then told Carlos he found Nguyen lying in the street when he arrived home that morning. He said he pulled her into their yard to get her to a safe location and see if he could help her.

While Varela and Carlos were talking, Carlos's girlfriend came outside and placed a towel over Nguyen. She also told Varela to go inside the house and wash the blood off his hands, but he told her, "No. I am not supposed to do that. I am going to wait." When Carlos asked Varela why there was vomit on the driver's side window of his car, he said he threw up when he arrived home and saw Nguyen's bloody body in the street.

In speaking with officers at the scene, Varela was defensive and argumentative. He lied about how much he drank that night and who he was with, and he expressed outrage at the officers' suggestions he was somehow responsible for Nguyen's injuries, which turned out to be fatal. She died 11 days later from blunt force trauma to the head. She also had hemorrhaging in her neck and fractured thyroid cartilage, indicating she had been strangled.

The police found Nguyen's pants, underwear, shoes, and socks in the front yard of the house directly across the street from where Varela lived. There was no blood in that area, nor was there any blood in the street leading to Varela's house. But there was a considerable amount of blood by Varela's vehicle, which was parked behind Carlos's car in front of their house. The blood was largely concentrated on the curb and adjacent lawn between those two vehicles. Blood also was found on the front bumper of Varela's vehicle and the rear of Carlos's car.

Varela was arrested on the scene. At that time, he had small scratches and abrasions on his face and arms, his knuckles were swollen, and

4

there was a bloody fingerprint on his chest. He was also found to have a blood alcohol level of .24 percent, which is three times the legal limit for driving.

Forensic testing revealed Varela also had semen and Nguyen's DNA on his penis. In addition, Varela's DNA was found on the inner waistband of Nguyen's underwear and on her left breast. And an unidentifiable sperm cell was found on her right breast. There were no signs, however, that Nguyen had been raped.

At trial, Varela presented a litany of witnesses who vouched for his good character and testified they had never seen him act violently. These friends and relatives of Varela consistently described him as kind, caring, and highly respectful of women. In response to this good character evidence, the prosecution presented evidence that Varela once told Carlos the reason he stopped drinking is that he had been violent with a former girlfriend.

Testifying in his own defense, Varela claimed he never said that to Carlos and had never been violent toward any of his girlfriends. He said he visited two bars the night before Nguyen was attacked. While leaving the second one, he fell in the parking lot, scraping his face and arms. Contrary to what he told Carlos at the scene, Varela claimed he also vomited on his car window at that time, due to all he had to drink. He then used his shirt to clean up the mess and threw his shirt out the window.

During his testimony, Varela admitted lying to the police about various matters related to his drinking. He insisted, however, he did not harm Nguyen in any way and was only trying to help her. Varela testified that upon arriving home that morning, he noticed Nguyen lying largely naked by the curb in front of the house across the street. The upper part of her body was on the lawn, and her lower body was in the street. When he went over to check on her, he discovered her face was badly bloodied, so he

5

searched her nearby clothes for a phone to call for help. Unable to find a phone, Varela decided to move Nguyen over toward his house. He testified he did so by carrying her fireman's style across his back and shoulders, but there was no blood on those areas of his body when the police arrived on the scene.

Varela told the jury he initially put Nguyen down near the curb between his and Carlos's cars before dragging her up closer to his house, which is when Carlos came out and started questioning him. Varela testified he got frustrated with Carlos because he seemed more concerned about how Nguyen got hurt than about trying to help her. Asked why his fly was almost completely unbuttoned at that time, Varela testified he could not remember.

In closing argument, defense counsel contended Varela was falsely implicated because he happened to be in the wrong place at the wrong time. Although counsel admitted she could not prove who killed Nguyen, she argued it could have been someone who lived in the neighborhood or was seen in the area before Nguyen was attacked. Defense counsel also assailed the police and forensic investigations as shoddy and incomplete.

The prosecutor argued Varela viciously attacked Nguyen with carnal intentions. He theorized the attack started in the yard across the street from Varela's house, which is where Nguyen's clothes were found. But Nguyen resisted and got away momentarily before Varela chased her down and brutally beat her near the curb between his and Carlos's cars. According to the prosecutor, Varela then dragged Nguyen up toward his house and became frustrated and defensive when Carlos appeared on the scene and started questioning him about Nguyen.

In the end, the jury convicted Varela of first degree murder and found true the special circumstance allegation the murder occurred during

the attempted commission of forcible rape. The trial court sentenced Varela to life in prison without the possibility of parole.

DISCUSSION

I.

THE EVIDENCE OF VARELA'S BAD CHARACTER

Varela's primary argument on appeal centers around Carlos's testimony that Varela once told him the reason he stopped drinking is that he had been violent with one of his former girlfriends. Varela contends this testimony constituted impermissible character evidence, but we find it was properly admitted to rebut the good character evidence the defense elicited from Carlos.

*A. Background*

At trial, Carlos was called as a witness by the prosecution to testify about his relationship with Varela and what he observed in his front yard on the morning Nguyen was attacked. On direct examination, Carlos testified he and Varela had trouble communicating and argued at times. And on some of those occasions, Varela lost his temper, cursed, and kicked the furniture. Carlos also said that, when Varela was a teenager, he would sometimes punch the wall when he was angry.[3]

On cross-examination by defense counsel, though, Carlos testified he had never seen Varela act violently toward another person. To the contrary, Carlos said Varela had a kind, caring, and helpful nature, and he was always respectful toward women.

---

[3] Varela did not dispute this during his testimony. He claimed the wall-punching permanently damaged his knuckles, which is why they looked swollen at the time of his arrest.

On redirect, the prosecutor followed up on that line of questioning by asking Carlos if Varela had ever told him anything about being violent with a former girlfriend. That prompted a foundation objection from defense counsel, which led to an in-chambers sidebar. The prosecutor argued that by eliciting evidence of Varela's good character on Carlos's cross-examination, defense counsel had "open[ed] the door" to bad character evidence on redirect. Therefore, his question to Carlos about Varela's violence with a former girlfriend was not improper.

Defense counsel denied opening the door to anything. She then directed the trial court to a police report the prosecutor was apparently relying on as the basis for his proposed question to Carlos. As read into the record by defense counsel, the report reflects an investigator had asked Carlos if he knew Varela to be violent with his girlfriends, to which Carlos replied, "'there was one time and that is the reason [Varela] stopped drinking.'" However, Carlos told the investigator he did not know any details about the incident. He said he learned about it from a woman named Ann.

When Carlos's testimony resumed, the prosecutor reminded him about his previous testimony concerning Varela's character, and Carlos confirmed his belief Varela was a nonviolent person in his interactions with others. The prosecutor then asked Carlos if Varela had ever told him the reason he stopped drinking is that he had been violent with one of his former girlfriends. After refreshing his memory with the police report, Carlos admitted Varela had told him that. But Carlos said that would not change his opinion that Varela had a nonviolent character.

During his subsequent testimony, Varela refuted Carlos on this point. He claimed he never told Carlos he stopped drinking because he had

been violent with a former girlfriend, and that is because he had never actually been violent with any of his girlfriends.

On the issue of character evidence, the trial court instructed the jury: "You have heard testimony that the defendant is a non-violent person. Evidence of the defendant's character for non-aggressiveness and peacefulness can by itself create a reasonable doubt whether the defendant committed murder as charged in Count 1. However, evidence of the defendant's good character may be countered by evidence of his bad character for the same trait.

"You must decide the meaning and importance of the character evidence. You may take that testimony into consideration along with all the other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt.

"The attorney for the People was allowed to ask defendant's character witnesses if they had heard the defendant had engaged in certain conduct. These 'have you heard' questions and their answers are not evidence that the defendant engaged in any such conduct. You may consider these questions and answers only to evaluate the meaning and importance of a character witness' testimony." (CALCRIM Nos. 350, 351.)

*B. Applicable Law and Standard of Review*

Pursuant to Evidence Code section 1101, character evidence is generally prohibited in criminal trials. (Evid. Code, § 1101, subd. (a).)[4] However, section 1102 permits evidence of the defendant's character in the form of an opinion or reputation testimony if it is offered by the defendant to

---

[4] Unless noted otherwise, all further statutory references are to the Evidence Code.

9

prove he acted in conformity with his character or it is offered by the prosecution to rebut such evidence. (§ 1102, subds. (a) & (b).)

In other words, section 1102 is a double-edged sword for the defense. If a witness gives favorable character testimony on behalf of the defendant, "'"the prosecution may inquire of the witness whether he has heard of acts or conduct by the defendant inconsistent with the witness' testimony." [Citation.] So long as the People have a good faith belief that the acts or conduct about which they wish to inquire actually took place, they may so inquire. [Citation.]'" (*People v. Ramos* (1997) 15 Cal.4th 1133, 1173.) As the trial court instructed in this case, such rebuttal evidence is admissible to assist the jury in assessing the probative value of the character witness's testimony. (*People v. Doolin* (2009) 45 Cal.4th 390, 434–435; *Ramos,* at p. 1173; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1315 (conc. & dis. opn. of Broussard, J.).)

"A trial court has broad discretion when determining the admissibility of rebuttal evidence, and we review a trial court's decision to admit such evidence for abuse of discretion." (*People v. Simon* (2016) 1 Cal.5th 98, 145.) An abuse of discretion occurs when the court acts in an "'arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.)

*C. Analysis*

In arguing the trial court abused its discretion in this case, Varela relies on the fact Carlos did not have personal knowledge of the alleged violence that occurred between Varela and his former girlfriend. So, when Carlos testified about the incident, he was providing what Varela describes as "purely reputational evidence." Varela contends that was

10

improper because Carlos's testimony about Varela's good character consisted of opinion testimony that was based on his first-hand observations of Varela.

As explained above, however, the prosecution is permitted to attack the credibility of a defense character witness by asking if they have heard about conduct of the defendant that is inconsistent with the witness's testimony. This is so even if, as here, the witness's good character testimony was in the form of an opinion, and the witness did not personally observe the bad conduct in question. (*People v. Doolin, supra,* 45 Cal.4th at pp. 434–435; *People v. Ramos, supra,* 15 Cal.4th at p. 1173; *People v. Hempstead* (1983) 148 Cal.App.3d 949, 954.) Therefore, it is immaterial the prosecution's rebuttal evidence took the form of reputation testimony, as opposed to opinion testimony.

Varela argues Carlos's lack of personal knowledge about Varela's alleged prior violence also undermines the notion the prosecutor had a good-faith belief Varela had actually been violent toward his former girlfriend. However, although the segment of the police report defense counsel read into the record indicates Carlos learned of Varela's past misconduct from a third party, Carlos testified Varela had *personally* told him he quit drinking because he had been violent with a former girlfriend. Because that information came from Varela himself, the prosecution had sufficient grounds to ask Carlos about it.

Varela also invokes section 352 as a basis for excluding Carlos's testimony about his violent conduct toward his former girlfriend. Pursuant to that section, a trial court may exclude rebuttal evidence if it is unduly time consuming or unduly prejudicial. But Carlos's testimony about Varela's alleged prior misconduct consumed very little time at trial, and it was not particularly detailed or inflammatory when compared to the underlying facts

11

of the charged offense. Moreover, despite what Varela allegedly told Carlos about being violent with his former girlfriend, that information did not alter Carlos's opinion that Varela was a nonviolent person. And Varela was permitted to call a slew of other character witnesses who vouched for his good character.

Under these circumstances, the trial court did not abuse its discretion by allowing the prosecutor to elicit testimony from Carlos about Varela's bad character. (See *People v. Doolin, supra,* 45 Cal.4th at pp. 438–439.) The evidence was properly admitted to rebut Carlos's testimony about Varela's good character and did not violate Varela's right to a fair trial. (*Ibid.*)

II.

THE PROSECUTOR'S ALLEGED MISUSE OF THE BAD CHARACTER EVIDENCE

Alternatively, Varela argues reversal is required because, during closing argument, the prosecutor misused Carlos's testimony about his bad character for its substantive truth. Respondent argues no misconduct occurred because the testimony was in fact admissible for its truth. Respondent has the better argument.

*A. Background*

During his lengthy closing argument, the prosecutor made but one mention of Carlos's testimony regarding Varela's violence toward his former girlfriend. While discussing the events leading up to Nguyen's murder, the prosecutor told the jury: "The defendant was sober for several years. You heard from the defendant's father. Why was he sober? The defendant's father, Carlos, told you why he was sober. Because the defendant admitted to him he stopped drinking because he was violent with a former girlfriend." Defense counsel did not object to these remarks.

12

*B. The Claim is Cognizable*

Generally, to preserve a claim of prosecutorial misconduct, the defendant must register an objection to the alleged misconduct in the trial court. (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.) However, because an objection to the prosecutor's reference to Carlos's testimony about why Varela stopped drinking would have drawn further attention to that testimony, and because respondent does not raise any procedural objections to our considering Varela's challenge to the reference, we will exercise our discretion to do so. (See *People v. Huggins* (2006) 38 Cal.4th 175, 206 [recognizing defense counsel may not want "to draw the jurors' attention to particular comments by the prosecutor by objecting to them"]; *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [noting appellate courts have discretion to consider issues that have not been properly preserved for review by a party].)

*C. Analysis*

On the merits, Varela contends the prosecutor's reference to Carlos's testimony about why he stopped drinking was an invitation for the jury to consider that testimony as proof he had been violent with his former girlfriend and had a propensity to be violent with women. Varela argues that was improper because Carlos's testimony on that topic was admitted solely to evaluate the meaning and importance of Carlos's testimony about his character.

The argument has superficial appeal, but it fails to recognize Carlos was not the only witness who testified about Varela's alleged statement about why he stopped drinking. Following Carlos's testimony on that topic, Varela himself took the stand and was asked by his own attorney if he ever told Carlos he stopped drinking because he had been violent with a

former girlfriend. Varela testified he never told Carlos that because he had never actually been violent with a former girlfriend.

"[W]hen a defendant takes the stand, 'his credibility may be impeached and his testimony assailed like that of any other witness.'" (*Portuondo v. Agard* (2000) 529 U.S. 61, 69.) One common way of doing this is by showing the defendant made a prior statement that is inconsistent with his trial testimony. As the trial court instructed in this case, such statements are admissible to evaluate the defendant's credibility *and* as proof the information in those statements is true. (§ 1235; *People v. Chhoun* (2021) 11 Cal.5th 1, 44; CALCRIM No. 318.)

Here, Varela's prior statement to Carlos that he stopped drinking because he had been violent with a former girlfriend was inconsistent with Varela's testimony that he had never been violent with any of his former girlfriends. Therefore, the prior statement was admissible not only to impeach Varela's credibility, but also as substantive proof Varela stopped drinking because he had in fact been violent with a former girlfriend. Therefore, the prosecutor's argument on that topic was not improper.

III.

THE JURY INSTRUCTION REGARDING VARELA'S GOOD CHARACTER

Varela contends the trial court's instructions were prejudicially flawed for failing to inform the jury it could use the evidence of his good character as creating a reasonable doubt as to both the murder charge and the special circumstance allegation. In light of the way the case was charged and argued, we find any error in the subject instruction was harmless.

*A. Background*

Varela was charged in a single-count information with murdering Nguyen in violation of Penal Code section 187, subdivision (a). As to that

14

count, it was alleged as a special circumstance that Varela murdered Nguyen while he was engaged in the attempted crime of rape.

At trial, the prosecution argued two theories of first degree murder, premeditation and felony murder. The first theory required the prosecution to prove Varela "acted willfully, deliberately, and with premeditation." The second theory required the prosecution to prove: "One, the defendant committed or attempted to commit rape; two, the defendant intended to commit rape; and, three, while committing or attempting to commit rape, the defendant caused the death of another person."

After instructing on these requirements, the trial court told the jurors, "If you find the defendant guilty of first degree murder, you must also decide whether the People have proved that the special circumstance is true." "To prove this special circumstance is true, the People must prove that: One, the defendant committed or attempted to commit rape; the defendant intended to commit rape; and, the defendant did an act that caused the death of another person." The trial court defined rape as forcible sexual intercourse with a woman without her consent. And it told the jury attempted rape requires proof the defendant both "took a direct but ineffective step toward committing rape" and "intended to commit rape."

As set forth above, the trial court also instructed the jury pursuant to CALCRIM No. 350 that evidence of Varela's "character for non-aggressiveness and peacefulness can by itself create a reasonable doubt whether [he] committed murder as charged in Count 1."

B. Analysis

Varela's instructional claim is aimed at CALCRIM No. 350. He does not dispute the correctness of the instruction as far as the murder charge was concerned. However, he argues the instruction should have been

15

worded to include the special circumstance allegation, so the jury would have known the good character evidence could also create reasonable doubt as to that component of the charges.

As a preliminary matter, respondent contends Varela forfeited this claim by failing to object to CALCRIM No. 350 as given or request a modification to the instruction. But because the instruction arguably implicated Varela's fair trial rights and he contends his attorney was ineffective for failing to request a more complete instruction, we consider his claim. (Pen. Code, § 1259; *People v. Butler* (2003) 31 Cal.4th 1119, 1128; *People v. Smithey* (1999) 20 Cal.4th 936, 976–977, fn. 7.)

In arguing CALCRIM No. 350 was defective for failing to include the special circumstance allegation, Varela impliedly concedes that failure was harmless if the jury convicted him of first degree murder on the felony murder theory, which was the prosecution's primary theory of first degree murder. That is because the elements of first degree felony murder and special circumstances felony murder are largely the same. Nevertheless, Varela maintains prejudice was likely to result if the jury convicted him of first degree murder on the premeditation theory, because that theory did not require a finding that Varela acted with the intent to rape, which was an element of the special circumstance allegation.

As explained above, however, to convict Varela of first degree premediated murder, the jury had to find he killed Nguyen willfully, deliberately, and with premeditation, which is a highly depraved state of mind. Even though the trial court's instruction on Varela's good character evidence did not expressly extend to the intent to rape element of the special circumstance allegation, we agree with respondent that "[n]o juror could possibly have concluded that Varela was so depraved and reprobate that he

16

was willing to kill [Nguyen with premeditation and deliberation], while simultaneously believing he had an upstanding moral compass that would have stopped him from" wanting to rape her. Therefore, any error in failing to expand CALCRIM No. 350 to include the special circumstance allegation was harmless under any standard of review.

IV.

THE JURY INSTRUCTIONS ON VOLUNTARY INTOXICATION

Varela claims the trial court gave prejudicially conflicting jury instructions on the permissible use of the evidence regarding his intoxication. This claim also fails for lack of prejudice.

*A. Background*

After instructing on murder and the prosecution's two theories of first degree murder, the trial court informed the jury pursuant to CALCRIM No. 625, "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation, or the defendant had the specific intent to rape" Nguyen.

In subsequently instructing on the special circumstance allegation, however, the trial court told the jury per CALCRIM No. 3426, "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence in deciding whether the defendant acted with specific intent to commit rape . . . as it applies to first degree felony murder or as it applies to the special circumstance." "You may not consider evidence of voluntary intoxication for any other purpose."

17

*B. Analysis*

Varela argues these two instructions "created a state of material, irreconcilable confusion" because whereas CALCRIM No. 625 permitted the jury to use the intoxication evidence in determining whether he had the intent to kill, acted with deliberation and premeditation, or had the intent to rape, CALCRIM No. 3426 limited consideration of that evidence to whether Varela had the intent to rape and expressly prohibited the jury from considering that evidence for any other purpose. Varela posits this prejudiced his defense because if the jury read CALCRIM No. 3426 as trumping CALCRIM No. 625, it would not have considered the evidence of his intoxication in deciding whether he acted with the intent to kill, deliberate, or premeditate.

Respondent argues Varela forfeited this claim by failing to object to the court's instructions on intoxication. We need not decide that issue, however, because even if there was instructional error, it is not reasonably probable Varela would have obtained a more favorable verdict had the error not occurred. (See *People v. Pearson* (2012) 53 Cal.4th 306, 325 [the reasonably probability test of harmless error applies to faulty instructions on voluntary intoxication].)

By finding Varela guilty of special circumstances murder, the jury necessarily determined he harbored the intent to rape. So, the only way he could have been prejudiced by the court's intoxication instructions was if the jury believed the evidence of his intoxication was insufficient to negate his intent to rape but nevertheless sufficient to negate his intent to kill, deliberate, or premeditate.

That strikes us as an exceedingly unlikely possibility. As respondent aptly puts it, Varela's intoxication was "an all or nothing

18

proposition" when it came to determining the effect of alcohol on his intent. Either Varela was too intoxicated to form the specific intent to rape as required for the special circumstance allegation, in which case he would have been too intoxicated to form the intent to kill, deliberate, and premeditate, as required for first degree murder. Or he was sober enough to form the intent to rape, in which case he would have been sober enough to form the intent to kill, deliberate, and premeditate.

That being the case, the alleged instructional error was harmless. Based on the jury's true finding on the special circumstance allegation, it is not reasonably probably that, had the jury been given the option to do so, it would have found the evidence of Varela's intoxication prevented him from forming the intent to kill, deliberate, or premeditate.

V.

THE JURY INSTRUCTION ON CONSCIOUSNESS OF GUILT

Next, Varela contends the trial court's instructions prejudicially precluded the jury from considering the evidence of his intoxication in deciding whether he knowingly made false or misleading statements before trial. Again, we disagree.

*A. Background*

Pursuant to CALCRIM No. 362, the trial court instructed the jury, "If the defendant made a false or misleading statement before the trial relating to the charged crime knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

19

Nothing in CALCRIM No. 362 prevented the jury from considering the evidence of Varela's intoxication in deciding whether he knowingly made any false or misleading statements before trial. As noted above, however, the trial court's instructions on voluntary intoxication—CALCRIM Nos. 625 and 3426—limited the jury's consideration of Varela's intoxication to whether he formed the specific intent required for the charged offense of first degree murder and the special circumstance allegation.

*B. Analysis*

Relying on *People v. Wiidanen* (2011) 201 Cal.App.4th 526 (*Wiidanen*), Varela argues the trial court should have modified CALCRIM Nos. 625 and 3426 to allow the jury to consider the evidence of his intoxication in determining whether he knowingly made any false or misleading statements before trial, i.e., while he was speaking with the police or Carlos at the scene of the crime. As with Varela's previous instructional argument, we consider this argument despite Varela's failure to raise it below, but ultimately reject it for lack of prejudice.

*Wiidanen* recognized "a defendant's false or misleading statements made when he was intoxicated may not be probative of the defendant's veracity, if the jury believed the defendant was too intoxicated to know his statements were false or misleading." (*Wiidanen, supra*, 201 Cal.App.4th at p. 533.) Therefore, the jury should be permitted to consider the defendant's intoxication in determining whether he knowingly made a false or misleading statement before trial, so as to an infer a consciousness of guilt. (*Ibid.*) *Wiidanen* also makes clear, however, the failure to so instruct will be deemed harmless if the defendant was sober enough to be aware of his guilt when he made the statements in question. (*Id.* at p. 534.)

20

Here, we know the jury believed that to be the case by virtue of its true finding on the special circumstance allegation. As discussed in the previous section, that finding demonstrates the jury rejected Varela's contention that he was too intoxicated to form the intent to rape. In light of that finding, it stands to reason the jury also would have rejected any claim that Varela was too intoxicated to be aware of his guilt when he was talking to the police and Carlos at the scene of the crime. Therefore, the failure to modify CALCRIM Nos. 625 and 3426 could not have prejudiced Varela.

VI.

FAILURE TO INSTRUCT ON THE PROSECUTION'S

UNTIMELY DISCLOSURE OF EVIDENCE

Varela's final instructional argument is based on the trial court's failure to give CALCRIM No. 306, which addresses the parties' duty to disclose discovery in a timely manner. Contrary to Varela's claim, however, the court did not abuse its discretion in failing to give that instruction.

*A. Background*

The discovery issue arose while defense counsel was cross-examining David Lopez, the lead investigator on the case. Defense counsel asked Lopez if he took any notes while he was reviewing the surveillance footage from the security cameras that were located in the area where Nguyen was attacked. Although those cameras did not capture the attack, defense counsel asked Lopez if he noted anything of significance when he reviewed the footage.

Lopez testified he did take some notes during his review of the surveillance footage, but he did not include them in his reports or make them available for discovery because he thought they were his own "work product." Lopez also cited the fact defense counsel had been provided a copy of the

21

surveillance tapes as another reason he believed his notes were not subject to discovery. After discussing the matter with counsel outside the presence of the jury, however, the trial court ordered the prosecutor to obtain Lopez's notes and provide them to the defense, which he did.

When Lopez's cross-examination resumed two days later, defense counsel questioned him about his understanding of his pretrial discovery obligations. Defense counsel also asked Lopez several questions about the notes he had taken while watching the surveillance footage. Most of that questioning centered around the timestamps that appear on the footage.

Based on Lopez's failure to disclose the notes before trial, defense counsel asked the trial court to give CALCRIM No. 306, which states a parties' failure to disclose discoverable evidence in a timely manner may affect both the fairness of the proceedings and the weight and significance of that evidence. Defense counsel argued the instruction was needed to "send a message" that discovery violations will not be countenanced and to assist the jury in assessing "all the evidence and the completeness or incompleteness and forthrightness and integrity of this investigation."

The trial court was not convinced. Having personally reviewed Lopez's notes, the court determined they did not entail "a tremendous volume of material," and their content was not such as to render their late disclosure prejudicial to the defense. The court also found it significant that defense counsel had been given broad leeway to cross-examine Lopez about the notes and why he failed to disclose them in a timely fashion. All things considered, the court did not believe the prosecution's discovery violation warranted a jury instruction on the issue.

*B. Applicable Law*

"Under the due process clause of the United States Constitution the prosecution must disclose to the defense any evidence that is 'favorable to an accused' and is 'material' on either guilt or punishment." (*People v. Cook* (2006) 39 Cal.4th 566, 587, quoting *Brady v. Maryland* (1963) 373 U.S. 83, 87.) A parallel duty also exists under state law. (See Pen. Code, § 1054.1, subds. (c), (e).)

If the prosecution fails to comply with its discovery obligations, the trial court may, as a possible sanction, inform the jury of that failure by giving CALCRIM No. 306. (See Pen. Code, § 1054.5, subd. (b).) However, trial courts "have broad discretion in determining the appropriate sanction for discovery abuse." (*People v. Jenkins* (2000) 22 Cal.4th 900, 951.) We will not disturb a trial court's ruling on that issue absent a clear abuse of that discretion. (*People v. Ayala* (2000) 23 Cal.4th 225, 299.)

*C. Analysis*

Varela admits Lopez's failure to disclose his notes before trial "was less about the precise nature of the [notes] and how [they] could or would have been used in support of the defense" and more about how that failure may have "impugned the integrity of the police investigation." But defense counsel explored the integrity issue when she cross-examined Lopez about the untimely disclosure of his notes. Although Lopez said he had been unclear about the scope of his discovery obligations when this case first arose, he now understood there is no exemption for so-called police "work product" and the law required him to disclose everything he produced during the course of his investigation.

That was sufficient to alert the jury to the seriousness of Lopez's discovery violation and its potential to undermine the integrity of his

23

investigation. Because the violation did not involve exculpatory evidence that was material to the defense, it did not impact the fairness of Varela's trial, and the trial court did not abuse its discretion in denying his request for a jury instruction on the issue.

## VII.

### CUMULATIVE ERROR

Varela asserts the alleged errors that occurred at his trial overlapped and compounded each other in a manner that undermined his constitutional right to due process. Therefore, even if the errors do not individually warrant reversal, he should be afforded a new trial on the basis of cumulative error. We acknowledge "'[a] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) But that is not the case here. Whether considered individually or in conjunction with one another, the alleged errors cited by Varela were harmless and did not violate his due process right to a fair trial.

## VIII.

### SUFFICIENCY OF THE EVIDENCE

Lastly, Varela asserts there is insufficient evidence to support the jury's verdict. The record shows otherwise.

*A. Standard of Review*

The standard of review for assessing the sufficiency of the evidence to support a criminal conviction is "highly deferential." (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) Our task is to "review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the

24

defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

In so doing, we do not reweigh the evidence or reevaluate the credibility of the trial witnesses; rather, "[w]e presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Lindberg, supra*, 45 Cal.4th at p. 27.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [it]."'" (*People v. Cravens* (2012) 53 Cal.4th 500, 508; *People v. Montanez* (2023) 91 Cal.App.5th 245, 270.)

*B. Analysis*

Varela's sufficiency-of-the-evidence argument is aimed at three different aspects of the prosecution's case: 1) identity, 2) intent, and 3) acts. We address each of them in turn.

1. Identity

As to the central issue of identity, Varela asserts "the percipient witness testimony, the physical evidence, and the forensic evidence all fall short" in terms of providing substantial evidence he was the person who attacked Nguyen. We cannot agree.

Granted, there was no direct evidence linking Varela to the attack. But Carlos's testimony as to what he saw when he opened his front door that morning—a bloody Varela kneeling besides Nguyen's beaten body without a shirt and his pants almost completely unbuttoned—was highly suspicious. And although Varela told Carlos he wanted to help Nguyen, Carlos described his demeanor as "super defensive."

There were also glaring holes in Varela's story as to what occurred before Carlos arrived on the scene. Although Varela testified he found Nguyen on the curb in front of his neighbor's house and carried her fireman's style across his shoulders to his front yard, there was no blood on that curb or on Varela's back or shoulders when the police arrived. But there was blood on the curb in front of Varela's parked car, which was not far from where Carlos spotted Varela and Nguyen.

In addition, forensic testing revealed the presence of Varela's DNA on Nguyen's underwear and breast, and Nguyen's DNA was found on Varela's penis, along with his own semen. At trial, Varela testified he touched his penis while the forensic analyst was swabbing it for DNA, in an attempt to explain how Nguyen's DNA may have been innocently transferred onto his penis. But the analyst who did the swabbing testified her customary practice was not to let a suspect touch his genitals during the swabbing process.

This conflicting testimony presented a credibility issue for the jury. By finding Varela guilty of murder, the jury rejected Varela's innocent transfer theory and determined he was lying about how Nguyen's DNA ended up on his penis. We cannot "substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

The defense also presented evidence that mistakes and accidents sometimes occur during the collection, analysis, and testing of DNA evidence and that a sample of blood taken from Varela's sweatshirt was inadvertently contaminated during the extraction process. But that error was detected in the lab review process, and the sample was retested for quality assurance. There was nothing to suggest it affected the reliability of the DNA testing

26

conducted in this case. And, again, the jury was entitled to reject the defense theories of contamination.

As to the issue of identity, the defense also tried to show the police did not sufficiently investigate other possible suspects in the case, such as Varela's neighbors or people who were seen in the area around the time Nguyen was attacked. But while some of these people may have had the opportunity to attack Nguyen, there was no evidence they actually did. The *mere possibility* that someone other than Varela might have killed Nguyen does not undermine our confidence in the verdict. Considering all the evidence in favor of the judgment below, there is substantial evidence to support the jury's determination that Varela was Nguyen's assailant.

2. Intent

We reach the same conclusion on the issue of intent. Varela contends there is no evidence he acted with premeditation in killing Nguyen, so as to support a finding of first degree murder on that theory, or that he intended to rape Nguyen, as required for the felony murder theory of first degree murder and the special circumstance allegation. But Varela had ample time to premeditate when he arrived back home that morning and saw Nguyen on the other side of the street. Even if he attacked her right after parking his car, we must remember "premeditation can occur in a brief period of time. '. . . Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .'" (*People v. Perez* (1992) 2 Cal.4th 1117, 1127.)

It is also important to keep in mind that Nguyen's clothes were found on one side of the street, and her bloody body was found on the other. As the prosecutor posited in closing argument, this indicates Varela initially

attempted to rape Nguyen in one location before beating her in another. The gap between these two events afforded Varela additional time to premeditate.

In addition, the DNA evidence demonstrated Varela had forcible sexual contact with Nguyen at some point during the attack, which supports a finding he intended to rape her. For all these reasons, we reject Varela's challenge to the sufficiency of the evidence on the issue of his intent.

3. Actus Reus

Lastly, Varela argues that, even if he intended to rape Nguyen, there is insufficient evidence he attempted to commit that offense by making "'a direct movement beyond preparation that would have accomplished the crime . . . if not frustrated by extraneous circumstances.'" (*People v. Scott* (2011) 52 Cal.4th 452, 488.) However, Varela was discovered kneeling next to Nguyen's largely naked body with his shirt off and his fly almost completely open, which shows he had moved past the preparatory stage of his plan. So does the DNA evidence. Suffice to say, the evidence is more than sufficient to support the jury's finding Varela killed Nguyen during the commission of an attempted rape.

## DISPOSITION

The judgment is affirmed.

GOODING, J.

WE CONCUR:

MOTOIKE, ACTING P. J.

SCOTT, J.